**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| EDWARD and NANCY KABLAOUI, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 2021-0700-PWG |
| | ) | |
| GERAR PLACE CONDOMINIUM | ) | |
| ASSOCIATION, and ROGER BINNER, | ) | |
| DEBRA SALIM, BRIAN COMROE, | ) | |
| KAREN STUCK, and DANNY | ) | |
| WATKINS, in their Individual Capacity | ) | |
| and Collectively as Members of the Council, | ) | |
| | ) | |
| Defendants. | ) | |

## MASTER'S REPORT

| | |
|---|---|
| Date Submitted: | March 11, 2022 |
| Final Report: | May 20, 2022 |

Christopher J. Isaac, Esq., Anthony Delcollo, Esq., OFFIT KURMAN, Wilmington, Delaware, *Attorneys for Plaintiffs*

Brian Thomas McNelis, Esq., YOUNG & McNELIS, Dover, Delaware, *Attorneys for Defendants*

**Griffin, M.**

Pending before me is a dispute between a property owner and their condominium's association and its board of directors regarding the board's imposition of a special assessment to pay for major exterior renovations on the condominium building, including the replacement of the windows, among other claims. The property owner seeks declaratory and injunctive relief and damages, contending that the association and board members breached their fiduciary and contractual duties by exceeding the association's authority under its governing documents because the windows were not common elements and board members had a self-serving interest. The association and board members filed a motion to dismiss the complaint, arguing, in part, that the governing documents authorized their actions to replace the windows and the demand requirement under Court of Chancery Rule 23.1 has not been met for the property owner's derivative claims. The property owner contends that they have brought a direct claim against the Association and the entire board is conflicted. I recommend that the Court grant the motion to dismiss, finding that the property owner has failed to state a claim for relief related to the special assessment contract claim since the windows are common elements, and the cost of their replacement is a common expense. I also recommend that the Court dismiss the property owner's derivative claims for failing to meet their burden of showing demand futility under Court of Chancery Rule 23.1. This is a final report.

1

## I.    Factual Background

Plaintiffs Edward and Nancy Kablaoui ("Kablaouis") have an ownership interest in Gerar Place ("Condominium"), which consists of 17 condominium units located at 59 Maryland Avenue, Rehoboth Beach, Delaware.[1]  The Kablaouis are members of Defendant Gerar Place Condominium Association ("Association"), which is a Delaware corporation.[2]  The Condominium was submitted to the Unit Property Act, 25 *Delaware Code* § 2201 *et seq*. ("UPA"), by the Declaration Submitting Real Property to the Provisions of Unit Property Act ("Declaration") dated April 6, 1976.[3]  Defendants Roger Binner ("Binner"), Debra Salim ("Salim"), Brian Comroe ("Comroe"), Karen Stuck ("Stuck"), and Danny Watkins ("Watkins") (collectively, "Council" and with the Association, "Defendants") form the Association's Council.[4]  In addition to the Declaration, the Condominium and Association is governed by the Code of Regulations ("COR" and collectively with the Declaration, the "Governing Documents").[5]

At the May of 2017 meeting of the Association, Binner proposed that the Association strike clauses from its Governing Documents prohibiting debris from

---

[1] Docket Item ("D.I.") 48, ¶ 1; *see also* D.I. 4, Ex. A ¶¶ 3, 5.

[2] D.I. 48, ¶¶ 1-2.

[3] *Id*., ¶¶ 8-9; D.I. 4, Ex. A.

[4] D.I. 48, ¶ 3.

[5] *Id*., ¶ 10; D.I. 4, Ex. B.

being swept from balconies and allowing the Association to remove barking dogs from the Condominium.[6] The Complaint alleges that these changes disproportionately benefitted Binner because he sweeps debris from his unit's balcony on the top floor, and has a dog that barks frequently.[7] The Association's Rules were allegedly modified to permit unfettered access to units by the Council.[8] On August 20, 2017, Binner entered the Kablaouis' unit at the Condominium, allegedly for no discernable purpose.[9] Binner said that this was to ensure that the master key worked.[10] Around 2018, the Council agreed, at Binner's request, to pay for the servicing of air conditioning (HVAC) units and for ant infestation treatment in the Condominium.[11] On February 22, 2021, the Kablaouis made a complaint against the Association through the Office of the Common Interest Community Ombudsman, in which they alleged that the Association failed to comply with the Governing Documents.[12]

---

[6] D.I. 48, ¶¶ 13, 17.

[7] *Id*., ¶¶ 14-16, 18-20.

[8] *Id*., ¶ 25.

[9] *Id*., ¶ 22.

[10] *Id*., ¶ 23.

[11] *Id*., ¶¶ 26-27.

[12] *Id*., ¶ 62; *id*., Ex. D. On May 19, 2021, the Common Interest Community Ombudsman sent the Kablaouis' filing to the Association. *Id*., Ex. D.

In the summer of 2020, unit 303 in the Condominium allegedly began experiencing water leaking from unit 403, Binner's and Comroe's unit.[13] The Council hired contractors to inspect the Condominium's windows for potential water damage on or about January 26, 2021.[14] On March 27, 2021, during an Association meeting, unit 303's owners complained that unit 403's windows were leaking and damaging their unit.[15] At that meeting, the Council informed the Association members that they had hired an engineer to examine water damage and that the engineering report showed that many of the Condominium's windows, including the Kablaouis' windows, were improperly installed and required replacement.[16]

The Kablaouis alleged that windows had previously been treated as the unit owners' responsibility and several owners had previously replaced their windows, glass sliders or window panes.[17] The Kablaouis retained an independent contractor who determined there was no need to replace their unit's windows.[18]

On June 17, 2021, the Council emailed Association members indicating that replacement of the Condominium's exterior windows and an extensive exterior

---

[13] *Id.*, ¶ 38.

[14] *Id.*, ¶ 39.

[15] *Id.*, ¶ 40.

[16] *Id.*

[17] *Id.*, ¶¶ 28-33.

[18] *Id.*, ¶¶ 41-42.

renovation was necessary and, on July 8, 2021, issued a memorandum explaining the proposed work and the special assessment that would be levied to fund the renovations.[19] On July 24, 2021, the Council held an emergency meeting and agreed to the replacement of the Condominium's windows ("Windows Replacement") and other exterior renovations and to the special assessment to pay for that work ("Special Assessment").[20]

## II.  Procedural Background

The Kablaouis filed a complaint on August 16, 2021, claiming breaches of contractual and fiduciary duties by the Association and the Council related to the Special Assessment, among other matters.[21] On September 14, 2021, the Kablaouis filed the first amended complaint.[22] On September 30, 2021, Defendants filed a motion to dismiss.[23] On October 13, 2021, the Kablaouis filed a motion for a temporary restraining order ("TRO Motion"), preliminary injunction and for an order permitting expedited discovery.[24] After filing an answering brief to

---

[19] *Id.*, ¶¶ 43-45.  Although not part of the pleadings, the Special Assessment was collected by the Association in the fall of 2021. *See* D.I. 52, 49:8-9.  The removal of the Windows began on or around January 3, 2022. *See id.* 5:3-6; D.I. 55, at 1.

[20] *Id.*, ¶ 48.

[21] D.I. 1.

[22] D.I. 8.

[23] D.I. 12.

[24] D.I. 14.

Defendants' motion to dismiss,[25] the Kablaouis filed a motion to amend the complaint on December 17, 2021.[26] Chancellor McCormick heard the TRO Motion on December 20, 2021 and denied the TRO Motion but granted expedition and permitted limited expedited discovery.[27]

On December 23, 2021, at the parties' request, I held an emergency teleconference to discuss implementation of the Chancellor's expedited discovery ruling before the scheduled removal of the Condominium windows ("Windows") on or around January 3, 2022.[28] In addition, I addressed several discovery-related disputes during the week of December 28, 2021.[29]

On January 3, 2022, the Kablaouis filed their second motion to amend the complaint ("Second Motion").[30] Defendants' January 12, 2022 letter indicated that they did not oppose this motion and requested additional time to file a reply brief for Defendants' motion to dismiss.[31] On January 13, 2022, I granted the Second Motion and asked the parties to file a new briefing schedule on the renewed motion to dismiss to be filed by Defendants that would address the soon-to-be-filed third

---

[25] D.I. 24.

[26] D.I. 25.

[27] D.I. 27; D.I. 45.

[28] D.I. 32.

[29] D.I. 33; D.I. 34; D.I. 35; D.I. 36; D.I. 37; D.I. 38; D.I. 39.

[30] D.I. 40.

[31] D.I. 41.

amended complaint.[32]  On January 21, 2022, the Kablaouis filed the third amended complaint ("Complaint").[33]  Count I of the Complaint alleges that the Council breached its fiduciary duties by imposing the Special Assessment and making other changes to the Governing Documents, including elimination of the prohibition on sweeping of dirt or debris from a unit's balcony and the removal of barking dogs, and allowing Binner unfettered access to all units.[34]  Count II asserts that the Association and Council breached their contractual duties by imposing the Special Assessment in violation of the Governing Documents.[35]  Count III seeks declaratory and injunctive relief against the Association and Council for breaching its contractual and fiduciary duties, while Count IV seeks injunctive relief against the Association and Council for breach of the UPA.[36]  The Kablaouis seek declaratory relief that the Association has violated the Governing Documents, prohibitory and mandatory injunctive relief that the Association will comply with the Governing

---

[32] D.I. 42; D.I. 43; D.I. 47.  In a January 20, 2022 letter, I instructed the parties to consider only the soon-to-be-filed renewed motion to dismiss and not refer back to the prior motion to dismiss' briefing. D.I. 47.

[33] D.I. 48.

[34] *Id.*, ¶¶ 66-72.

[35] *Id.*, ¶¶ 73-77.

[36] *Id.*, ¶¶ 78-86.

Documents and not issue special assessments on non-common elements or improper violations in the future, damages, and attorney's fees and costs.[37]

On January 24, 2022, the parties submitted a proposed schedule and requested that the Court resolve a request for a stay of discovery pending a decision on the soon-to-be-filed Defendants' motion to dismiss the third amended complaint ("Motion").[38] On January 28, 2022, I entered a scheduling order and stayed discovery pending a decision on the soon-to-be-filed Motion.[39] Defendants filed the Motion on February 7, 2022 and their opening brief on February 25, 2022, arguing that the Complaint should be dismissed under Rule 12(b)(6) and Rule 23.1, among other grounds.[40] The Kablaouis' March 4, 2022 answering brief argues against dismissal, and Defendants filed a March 11, 2022 reply brief.[41]

---

[37] *Id.*, at 24-25.

[38] D.I. 49.

[39] D.I. 50. In that order, I noted that the Complaint was the operative pleading in this matter and that the earlier motion to dismiss was moot. *Id.*, at 10.

[40] D.I. 51.

[41] D.I. 54: D.I. 55.

### III. Analysis

*A. Standards of Review*

For a motion to dismiss under Rule 12(b)(6), "the governing pleading standard in Delaware to survive a motion to dismiss is reasonable 'conceivability.'"[42] When considering a motion to dismiss under Rule 12(b)(6), the court must "accept all well-pleaded factual allegations in the Complaint as true ..., draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[43] The court, however, need not "accept conclusory allegations unsupported by specific facts or ... draw unreasonable inferences in favor of the non-moving party."[44]

Under Court of Chancery Rule 23.1, a stockholder who seeks to displace the board's authority by asserting a derivative claim on behalf of a corporation must "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort."[45] In

---

[42] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011) (citation omitted).

[43] *Id.* at 536 (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).

[44] *Price v. E.I. DuPont de Nemours & Co., Inc.*, 26 A.3d 162, 166 (Del. 2011) (citing *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009)), *overruled on other grounds by Ramsey v. Ga. S. Univ. Advanced Dev. Ctr.*, 189 A.3d 1255 (Del. 2018).

[45] *In re Kraft Heinz Co. Derivative Litig.*, 2021 WL 6012632, at *4 (Del. Ch. Dec. 15, 2021) (quoting Ct. Ch. R. 23.1).

conducting this analysis, "[t]he court is confined to the well-pleaded allegations in the Complaint, the documents incorporated into the Complaint by reference, and facts subject to judicial notice."[46] "Rule 23.1 is not satisfied by conclusory statements or mere notice pleading."[47]

*B. The Kablaouis' Special Assessment Claim is Dismissed for Failure to State a Claim.*

The Kablaouis claim Defendants breached their contractual duties by imposing the Special Assessment for the Windows Replacement, because the Windows are not common elements, in violation of the Governing Documents and the UPA.[48] Defendants respond that the Governing Documents designate the Windows as common elements and authorize the Association to replace the Windows and to assess replacement costs as common expenses.[49] The Governing Documents are "contracts among the unit owners created under the UPA's statutory framework."[50] It is well settled that "a condominium declaration and its accompanying code of regulations together form no more than an ordinary contract between the unit owners (and, initially, the developer), created under the statutory

---

[46] *In re Kraft Heinz Co. Derivative Litig.*, 2021 WL 6012632, at *4 (citations omitted).

[47] *Id.* (internal quotation marks and citation omitted).

[48] D.I. 48, ¶¶ 73-77.

[49] D.I. 53, at 10-13.

[50] *Goss v. Coffee Run Condo. Council*, 2003 WL 21085388, at *7 (Del. Ch. Apr. 30, 2003) (citation omitted).

10

framework of the Unit Properties Act."[51] To resolve the Special Assessment claim,[52] I consider (1) whether the Windows Replacement cost was a common expense, and (2) whether the Association had authority to replace the Windows.

### 1. The Cost of the Windows Replacement Was a Common Expense.

I begin my analysis with the UPA, which "establishes the rights and interests that govern [properties submitted under the UPA, like the Condominium]."[53]  The

[51] *Council of the Dorset Condo. Apartments v. Gordon*, 801 A.2d 1, 5 (Del. 2002) (citation omitted); *accord N&P Partners, LLC v. Council of Unit Owners of Bayberry Woods Condo.*, 2006 WL 456781, at *4 (Del. Ch. Feb. 22, 2006).

[52] Defendants argue that the Kablaouis' Special Assessment contract claim and their related breach of fiduciary duty claim arise out of the same facts, so the breach of fiduciary duty claim must be dismissed. D.I. 53, at 19-20.  The Kablaouis contend that their breach of fiduciary duty claim goes to the Council's process of issuing the Special Assessment and is not a restatement of the contractual claim. D.I. 54, at 21.  "Courts will dismiss the breach of fiduciary [duty] claim where the two claims overlap completely and arise from the same underlying conduct or nucleus of operative fact." *Backer v. Palisades Growth Cap. II, LP*, 246 A.3d 81, 109 (Del. 2021) (quoting *Grunstein v. Silva*, 2009 WL 4698541, at *6 (Del. Ch. Dec. 8, 2009)) (internal quotation marks omitted) (alteration in original); *see also Villages of Five Points Ventures, LLC v. Villages of Five Points Prop. Owners Ass'n, Inc.*, 2020 WL 6689973, at *6 (Del. Ch. Nov. 13, 2020) ("where fiduciary claims are duplicative of contractual claims, it is appropriate to dismiss the former").  Since the Association's authority to impose the Special Assessment is governed by contractual provisions of the Governing Documents, and the conduct and facts at issue with both claims are the same, the Kablaouis' recasting of the contractual duty as a fiduciary duty must be dismissed. *Compare* D.I. 48, ¶ 67(d) (alleging that a violation of a contractual duty was a breach of fiduciary duty) *with id.*, ¶ 76 (alleging breach of contract for the same allegation).

[53] *Goss*, 2003 WL 21085388, at *9 n. 42 (quoting *Council of Unit Owners of Pilot Point Condo. v. Realty Growth Investors*, 436 A.2d 1268, 1278 (Del. Ch. 1981), *aff'd in part*, 453 A.2d 450 (Del. 1982)); *see also* D.I. 4, Ex. A, at 1; *Id.*, Ex. B, art. X.  I consider briefly whether the UPA or DUCIOA controls for the Condominium.  The Condominium is a pre-existing community under DUCOIA, since it was submitted to the UPA in 1976. *See* D.I. 4, Ex. A, at 1; 25 *Del. C.* §81-116.  And, recent amendments to DUCOIA make clear that for all pre-existing communities, "existing provisions of those declarations, bylaws, codes of regulations, declaration plans, plats or plans … not in conflict with the UPA (Chapter

11

UPA and the Governing Documents provide that the Association may assess unit owners for their proportionate share of common expenses.[54] The UPA defines a "Common Expense" to include "[e]xpenses of administration, maintenance, repair and replacement of the common elements."[55] If the Windows are common elements, then the cost of the Windows Replacement is a common expense under the UPA.

Section 2202(3) of the UPA does not clearly specify whether the Windows are common elements.[56] "To determine whether or not the [W]indows … fall within the category of common elements or are otherwise covered as a common expense, [the Court] must look to the language of the [Governing Documents]."[57] When analyzing the Governing Documents, I apply the principles of contract interpretation to ascertain the parties' intent.[58] "The proper construction of [a contract] … is purely a question of law, as is the proper interpretation of specific contractual

---

22 of this title), shall be controlling in the event of any express conflict between those existing provisions (as duly amended) and the provisions of this chapter." 25 *Del. C.* §81-119. So, this matter is properly considered under the UPA and not DUCOIA.

[54] 25 *Del. C.* §2232; 25 *Del. C.* §2233; D.I. 4, Ex. A, ¶ 18; *Id.*, Ex. B, Art. VI, §1.

[55] 25 *Del. C.* §2202(4)(a).

[56] 25 *Del. C.* §2202(3).

[57] *Council of Dorset Condo. Apartments v. Gordon*, 801 A.2d 1, 5 (Del. 2002).

[58] *See Goss*, 2003 WL 21085388, at *7; *see also Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006) ("When interpreting a contract, the role of a court is to effectuate the parties' intent.").

12

language."[59]  Under Delaware caselaw, contracts are read "as a whole …, so as not to render any part of the contract mere surplusage" or to "render a provision or term 'meaningless or illusory.'"[60]  The Court "ascribes to the words their common or ordinary meaning, and interprets them as would an objectively reasonable third-party observer."[61]  It is well-established that Delaware courts can look to dictionaries for assistance in determining the intended meaning of contract terms.[62]  "[A] court is precluded from resorting to extrinsic evidence to interpret contractual language which is plain and clear on its face."[63]

The Declaration defines what is a common element and what is part of an individual unit.  "Each condominium unit shall consist of an enclosed space bounded by the undecorated and unfinished interior surface of the perimeter walls, ceiling and floor surrounding the space within the area as a unit …"[64]  The Declaration defines

---

[59] *Wenske v. Blue Bell Creameries, Inc.*, 2018 WL 3337531, at *10 (Del. Ch. July 6, 2018) (internal quotation marks and citations omitted) (ellipses in original), *reh'g denied,* 2018 WL 5994971 (Del. Ch. Nov. 13, 2018).

[60] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (internal quotation marks and citations omitted); *see also Ray Beyond Corp. v. Trimaran Fund Mgmt., LLC*, 2019 WL 366614, at *5 n. 62 (Del. Ch. Jan. 29, 2019).

[61] *Lawhon v. Winding Ridge Homeowners Ass'n, Inc.,* 2008 WL 5459246, at *6 (Del. Ch. Dec. 31, 2008) (internal quotation marks and citations omitted).

[62] *See Lorillard Tobacco Co.*, 903 A.2d at 738 ("dictionaries are the customary reference source that a reasonable person in the position of a party to a contract would use to ascertain the ordinary meaning of words not defined in the contract").

[63] *Goss*, 2003 WL 21085388, at *7  (citation omitted).

[64] D.I. 4, Ex. A, ¶ 3.  Any facility or installation designated as a common element is excluded from the unit. *Id.*

common elements to include "[t]he outside exterior walls, including window glass"[65] and "[t]he party walls between the various units."[66] In addition, it includes "[a]ll other elements of the building necessary or convenient to its existence, management, operations, maintenance and safety" as common elements.[67] The Declaration also states that unit owners have the right to "repair and replace … every … storm window."[68] The COR provides that "repairs to internal installations of each individual unit not made common elements by the Declaration, such as … windows … shall be at the unit owner's expense."[69]

The Kablaouis contend the Governing Documents are ambiguous, pointing to the Declaration's provision allowing unit owners to replace storm windows and to the COR's provision allowing unit owners to replace windows in the unit, along with the Council's past conduct, to prove the Windows are not common elements.[70] They interpret the Governing Documents as limiting common element windows to those "not contained in the individual units."[71] Defendants dispute any ambiguity in the Governing Documents and argue that the integrated window frames being replaced

---

[65] *Id.*, Ex. A, ¶ 4(i).

[66] *Id.*, Ex. A, ¶ 4(k).

[67] *Id.*, Ex. A, ¶ 4(s).

[68] *Id.*, Ex. A. ¶ 16(c).

[69] D.I. 4, Ex. B, art. VI, §2(b).

[70] D.I. 54, at 12.

[71] *Id.*, at 13.

through the Special Assessment are not internal installations and do not fall under the COR's provisions allowing the unit owners to replace internal windows.[72]

I do not find that the Governing Documents, when read as a whole, are ambiguous. The Declaration includes elements of the outside exterior walls of the Condominium, including structural elements of the Windows such as the window glass, as common elements. Window framing is included as a structural element of windows since it is necessary to support the window glass and, together with the glass, serves as an integrated window unit.[73] Further, a "storm window" is "a sash placed outside an ordinary window as a protection against severe weather"[74] or "an extra window that is put on the usual window for protection in bad weather."[75] Based on these dictionary definitions, a storm window is not part of the structural window itself, but an additional item that a property owner could use for extra protection. And, when read in context, the COR provides that windows that are "internal installations of each individual unit" and "not made common elements by the declaration" are repaired at the unit owner's expense.[76] The repair cost assessed to

---

[72] D.I. 55, at 4-5.

[73] *See id.*, at 5.

[74] *Storm Window*, Merriam-Webster's Dictionary, https://www.merriam-webster.com/dictionary/storm%20window (last accessed May 18, 2022).

[75] *Storm Window*, Cambridge English Dictionary, https://dictionary.cambridge.org/us/dictionary/english/storm-window (last accessed May 18, 2022).

[76] D.I. 4, Ex. B, art. VI, § 2(b).

unit owners is limited to the cost of repairing interior windows that are part of the individual unit and not windows that are part of the common elements. Providing that unit owners are responsible for the expense of repairing internal windows is not inconsistent with obligating the Association to pay the cost of repairing and replacing common elements, such as exterior windows.[77] I find that the Governing Documents provide that the Windows, including glass and framing, are elements of the building "necessary or convenient to its existence"[78] and are common elements.[79]

2. <u>The Association and Council Has the Duty to Maintain and Replace the Windows</u>.

The Kablaouis claim that the Association and the Council breached their contractual duties because the unit owners have the duty and right to replace the Windows.[80] I begin my analysis with the UPA.[81] Section 2213 of the UPA states:

---

[77] Additionally, the Association and the unit owners enjoy mutual easements related to where the common elements encroach upon any unit. *See* D.I. 4, Ex. A, ¶ 15(e). So, to the extent that the structural components of the windows extend into the unit as defined in the Declaration or that non-structural elements of the windows encroach upon structural components of the windows, mutual easements allow the Association and the unit owners to access and maintain the encroachment.

[78] D.I. 4, Ex. A, ¶ 4(s).

[79] Since I conclude that the Governing Documents are not ambiguous, I do not consider extrinsic evidence related to past practices of the Association with regard to payment for windows' replacement. *See supra* note 63 and accompanying text.

[80] D.I. 54, at 12-13.

[81] *See Goss v. Coffee Run Condo. Council*, 2003 WL 21085388, at *9 (Del. Ch. Apr. 30, 2003) (citing *Council of Unit Owners of Pilot Point Condo. v. Realty Growth Investors*, 436 A.2d 1268, 1278 (Del. Ch. 1981), *aff'd in part*, 453 A.2d 450 (Del. 1982)).

16

"The maintenance, repair and replacement of the common elements and the making of improvements or additions thereto shall be carried on only as provided in the code of regulations."[82] And, Section 2211(1) of the UPA provides that the duties of the condominium council "shall include … [t]he maintenance, repair and replacement of the common elements."[83] So, under the UPA, the homeowner's association has responsibility for the repair, maintenance, and replacement of the property's common elements, as governed by the property's code of regulations.[84] The COR states, in pertinent part, that "the Council shall be responsible for the … [m]aintenance, repair and replacement of the common elements and facilities of the project."[85] The COR also defines the unit owners' responsibilities: "Every unit must promptly perform all maintenance and repair work within his own unit."[86] As discussed previously, it further states, "All the repairs to internal installations of each individual unit not made common elements by the declaration, such as … windows … and all other accessories belonging to the unit area shall be at the unit owner's expense."[87] Thus, the Council and Association must maintain the common elements,

---

[82] 25 *Del. C.* §2213; *see also* 25 *Del. C.* §2205.

[83] 25 *Del. C.* §2211(1).

[84] *Goss*, 2003 WL 21085388, at *9.

[85] D.I. 4, Ex. B, art. IV, §3(a).

[86] *Id.*, Ex. B, art. VI, §2(a).

[87] *Id.*, art. VI, §2(b).

and individual unit owners are responsible for repair work on non-common elements within their units. Because I have determined that the Windows are common elements, they are the responsibility of the Council and Association to replace, not individual unit owners.

In summary, since I determine that the Windows are common elements, the Special Assessment was a common expense, and the Association had authority to replace the Windows Replacement, I recommend that the Court dismiss the Kablaouis' claims that Defendants breached their contractual duty by imposing the Special Assessment and undertaking the Windows Replacement.

## C. The Kablaouis' Remaining Claims Must Also Be Dismissed.

The Kablaouis have also asserted breach of fiduciary duty claims against the members of the Council.[88] Defendants contend that these are derivative claims and have moved to dismiss these claims under Court of Chancery Rule 23.1 for failure to plead demand futility.[89] The Kablaouis respond that they pleaded direct claims and, alternatively, that demand would be futile.[90] I address whether the Kablaouis'

---

[88] *See* D.I. 48, ¶¶ 65-72.

[89] D.I. 51, at 14-17.

[90] D.I. 54, at 16-20.

18

claims are direct or derivative and, if derivative, whether they have met the heightened pleading requirements of Rule 23.1.[91]

1. <u>The Kablaouis' Claims are Derivative.</u>

The Kablaouis argue that their claims are direct and they suffered individual harm because their windows did not need replacing and they lost their ability to contract with the service provider of their choice and to select the price and quality of the replacement windows.[92] The Association responds that the Kablaouis' alleged harm is not separate and distinct from that of the Association and other unit owners, and the remedy sought would run to the Association and all unit owners.[93]

"A derivative suit enables a stockholder to bring a suit on behalf of the corporation for harm done to the corporation," and any recovery for that harm goes

---

[91] *See* Ct. Ch. R. 23.1. Although neither party argues this point, for completeness, I consider whether 25 *Del. C.* §2210 would allow the Kablaouis to bring this action without meeting the heightened pleading standards in Rule 23.1. Section 2210 "states that a suit alleging noncompliance with a condominium's code of regulations or administrative provisions may be brought '*in a proper case* by an aggrieved unit owner,' rather than by a member of the council." *Breedy-Fryson v. Towne Ests. Condo. Owners Ass'n, Inc.*, 2010 WL 718619, at *14 (Del. Ch. Feb. 25, 2010) (quoting 25 *Del. C.* § 2210). I follow then-Vice Chancellor Strine's holding in *Breedy-Fryson* that, where a unit owner asserts claims belonging to an association, the General Assembly "intended, by the words 'proper case,' to impose a demand excusal requirement as is typical … when stockholders attempt to bring derivative claims," or as required under Rule 23.1. *Id*. (citations omitted).

[92] D.I. 54, at 16-17.

[93] D.I. 55, at 8-9.

to the corporation.[94] "However, a stockholder who is directly injured retains the right to bring an individual action for injuries affecting his or her legal rights as a stockholder."[95] The "[p]laintiffs' classification of the suit is not binding,"[96] and "the Court looks at the nature of the wrong alleged, not merely at the form of words used in the complaint."[97] The determination of whether a stockholder's claim is direct or derivative "turn[s] solely on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?"[98]

"Where all of a corporation's stockholders are harmed and would recover *pro rata* in proportion with their ownership of the corporation's stock solely because they are stockholders, then the claim is derivative in nature."[99] But, "a direct, individual claim of stockholders that does not depend on harm to the corporation can also fall on all stockholders equally, without the claim thereby becoming a derivative

---

[94] *Brookfield Asset Mgmt., Inc. v. Rosson*, 261 A.3d 1251, 1262-63 (Del. 2021) (citation omitted).

[95] *Id.*, at 1263 (citation omitted).

[96] *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1035 (Del. 2004) (internal quotation marks and citation omitted).

[97] *Blue v. Fireman*, 2022 WL 593899, at *5 (Del. Ch. Feb. 28, 2022) (internal quotation marks and citations omitted).

[98] *Tooley*, 845 A.2d at 1033; *accord Brookfield Asset Mgmt.*, 261 A.3d at 1263.

[99] *Blue*, 2022 WL 593899, at *6 (internal quotation marks and citation omitted).

20

claim."[100] "By contrast, a stockholder pleads a direct claim if he demonstrate[s] that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation."[101] Direct claims include contractual rights that the stockholder, or member, holds against the corporation.[102]

Here, I find the alleged harm related to the alleged breaches of fiduciary duty was suffered by the Association.[103] "It is well established that the directors [of a

---

[100] *Tooley*, 845 A.2d at 1037; *accord Brookfield Asset Mgmt.*, 261 A.3d at 1272 (quoting *Tooley*, 845 A.2d at 1037); *see also In re Williams Cos. S'holder Litig.*, 2021 WL 754593, at *17 (Del. Ch. Feb. 26, 2021) (*Tooley* "distinguish[ed] between (i) an injury that fell *indirectly* on all stockholders equally, which supported a derivative claim, and (ii) an injury that affected all stockholders *directly*, even if all stockholders suffered the same injury, which gave rise to a direct claim").

[101] *Blue*, 2022 WL 593899, at *6 (internal quotation marks and citation omitted) (alteration in original).

[102] *See Tooley*, 845 A.2d at 1039 (recognizing that a contractual right against the corporation could be enforced in a direct action); *In re Activision Blizzard, Inc. S'holder Litig.*, 124 A.3d 1025, 1049 (Del. Ch. 2015) ("Direct claims also include causes of action to enforce contract rights that stockholder's possess under the corporation's certificate of incorporation and bylaws.") (citations omitted); *id.* at 1050 ("Stockholders similarly can sue directly to enforce contractual constraints on a board's authority under the charter, bylaws, and provisions of the DGCL.") (citations omitted).

[103] This is in contrast to the alleged harm related to the contractual claims discussed *supra* in Section III.B. For the reasons stated there, the Governing Documents create a contract between the Kablaouis and the Association. *See supra* notes 50-51 and accompanying text. The claims arising out of alleged breaches of those contracts may be pursued directly. *See supra* note 102 and accompanying text. The alleged harm for that breach of contract is suffered by all Association members individually and affects all members directly. *See supra* note 100 and accompanying text. In contrast, the more remote harms alleged related to the Council members' fiduciary breaches affect the Association and its members only indirectly. *See infra* note 133; *see also Howard v. Edgar*, 2021 WL 3144726, at *3 (Del. Ch. July 23, 2021) (noting that, in the context of homeowners' association litigation, the court will consider a property owner's claims as derivative unless there is a harm to the

21

Delaware corporation] owe their fiduciary obligations to the corporation and its shareholders."[104] The Association is a Delaware corporation, and the Kablaouis are members of the Association.[105] The Kablaouis argue that the harm is caused by "[t]he Council … not employing the proper process" in replacing the Windows.[106] This alleged harm is not is unique to the Kablaouis or independent from their status as members of the Association. Therefore, the harm arising from any breaches of fiduciary duty runs to the Association.

Similarly, any recovery on the Kablaouis' fiduciary duty claims would flow to the Association. If the Council members had violated their fiduciary duties, then the Association would be the beneficiary of any recovery, and the Kablaouis would receive a recovery only proportionally because of their status as members of the Association.[107] Thus, all of the Kablouis' remaining fiduciary duty claims are derivative, and the Kablaouis must comply with the pleading requirements of Rule 23.1.

---

property owner or his property specifically); *Beck v. Greim*, 2018 WL 4938783, at *8 n. 60 (Del. Ch. Oct. 11, 2018).

[104] *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 99 (Del. 2007) (citing *Guth v. Loft*, 5 A.2d 503, 510 (Del. 1939)).

[105] D.I. 48, ¶¶ 1-2.

[106] D.I., 54, at 16-17. The Kablaouis also argue that they have contract-based harms. Those direct claims have already been addressed. *See supra* Section III.B.

[107] *See Feldman v. Cutaia*, 951 A.2d 727, 733 (Del. 2008).

## 2. Rule 23.1 Requires that the Kablaouis' Derivative Claims be Dismissed.

"Court of Chancery Rule 23.1 implements the substantive demand requirement at the pleading stage by mandating that derivative complaints 'allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort.'"[108] "The decision whether to initiate or pursue a lawsuit on behalf of the corporation is generally within the power and responsibility of the board of directors."[109] A stockholder plaintiff may pursue claims on a corporation's behalf "if (1) the corporation's directors wrongfully refused a demand to authorize the corporation to bring the suit or (2) a demand would have been futile because the directors were incapable of impartially considering the demand."[110] The Kablaouis allege that a pre-suit demand would have been futile.[111]

In *United Food & Com. Workers Union & Participating Food Indus. Emps. Tri-State Pension Fund v. Zuckerberg* ("*Zuckerberg*"), the Delaware Supreme Court

---

[108] *United Food & Com. Workers Union & Participating Food Indus. Emps. Tri-State Pension Fund v. Zuckerberg* [hereinafter "*Zuckerberg*"], 262 A.3d 1034, 1048 (Del. 2021) (quoting Ct. Ch. R. 23.1).

[109] *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 120 (Del. Ch. 2009) (citing 8 *Del. C.* § 141(a)).

[110] *Firemen's Ret. Sys. of St. Louis on behalf of Marriott Int'l, Inc. v. Sorenson*, 2021 WL 4593777, at *6 (Del. Ch. Oct. 5, 2021) (citation omitted).

[111] D.I. 48, ¶ 65(a); D.I. 54, at 18-20.

established a three-prong test for assessing demand futility, which provided that a court should considered, director-by-director:

> (i) whether the director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand;
> (ii) whether the director faces a substantial likelihood of liability on any of the claims that would be the subject of the litigation demand; and
> (iii) whether the director lacks independence from someone who received a material personal benefit from the alleged misconduct that would be the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand.
>
> If the answer to any of the questions is "yes" for at least half of the members of the demand board, then demand is excused as futile.[112]

"The court 'counts heads' of the members of a board to determine whether a majority of its members are disinterested and independent for demand futility purposes."[113]

The Council consists of five members – Binner, Comroe, Salim, Watkins and Stuck.[114] To show futility, the Kablaouis "must plead with particularity facts establishing that a majority of the [Council members] are subject to an influence that would sterilize their discretion with respect to the litigation demand."[115] So, the Kablaouis must make that showing for three members of the Council. For purposes of resolving the Motion, I will assume that the Kablaouis have pleaded with

---

[112] *Zuckerberg*, 262 A.3d at 1048.

[113] *In re Kraft Heinz Co. Derivative Litig.*, 2021 WL 6012632, at *5 (Del. Ch. Dec. 15, 2021) (internal quotation marks and citation omitted).

[114] D.I. 48, ¶ 3.

[115] *Zuckerberg*, 262 A.3d at 1056.

particularity facts showing that Binner and Comroe are conflicted such that they could not have exercised impartial judgment regarding a litigation demand. That leaves three Council members for consideration.

I first consider Council members Salim and Watkins. The Complaint alleges no particularized facts about either Salim or Watkins.[116] Rather, the Kablaouis allege in a conclusory manner that "Binner and Comroe … dominated and controlled other members of the Association by virtue of their position[]on the Council."[117] With no particularized facts to support that conclusion, the Kablaouis have failed to establish that Salim or Watkins could not impartially consider a demand related to any of the Kablaouis' claims.[118]

Next, I consider whether the Kablaouis have pleaded particularized facts sufficient to create reasonable doubt that Stuck could not exercise disinterested and

---

[116] D.I. 48.

[117] *Id.*, ¶ 67(h).

[118] In their answering brief, the Kablaouis do not argue that demand on Salim or Watkins would have been futile but repeat their conclusory arguments. D.I. 54, at 19. They include a February 17, 2021 letter from the Association's attorney responding to the Kablaouis' attorney stating that the individual members of the Council no longer wished further dialogue with the Kablaouis about matters referenced in their attorney's letter and communications should be directed to the Association's management company. *See* D.I. 54, Ex. A. First, this letter is not incorporated into the Complaint by reference and may not be considered in the demand futility analysis. *See In re Kraft Heinz Co. Derivative Litig.*, 2021 WL 6012632, at *4. Second, the letter does not detail the matters it references and it predates the Council's discussions on the Special Assessment, which first occurred at a March 27, 2021 Association meeting. *See* D.I. 54, ¶ 40. Accordingly, it does not show that Council members could not impartially consider a litigation demand by the Kablaouis related to the Special Assessment.

25

independent judgment regarding a demand. The Complaint alleges that Stuck's "unit has had its windows replaced, yet she is on the Council that is attempting to prevent individual unit owners from repairing and maintaining their own windows."[119] The Kablaouis also make the conclusory assertion that Stuck "possesse[d] first-hand knowledge that the [Condominium] has always held individual unit owners responsible for repairs and maintenance to windows."[120]

Under the first prong of the *Zuckerberg* test, the Court considers whether the Kablaouis pleaded particularized facts showing Stuck received a material personal benefit from the alleged misconduct that is unique to her.[121] The Kablaouis argue that their allegations show Struck "acquiesc[ed] to the replacement of windows because of issues unique to her unit."[122] I do not find Stuck has received a unique, personal benefit – all Association members received the benefit of having their windows replaced.[123]

---

[119] D.I. 48, ¶ 67(e). Another portion of the Complaint similarly alleges that "Stuck's unit had its windows replaced by the individual unit owner prior to the proposed repairs at issue in this case." *Id.*, ¶ 31.

[120] *Id.*, ¶ 67(e).

[121] *See Patel v. Duncan*, 2021 WL 4482157, at *19 (Del. Ch. Sept. 30, 2021), *as corrected* (Oct. 4, 2021).

[122] D.I. 54, at 3.

[123] In fact, the Special Assessment may have resulted in her detriment since she was obligated to pay her share for the replacement of all Condominium windows, when her unit's windows had already been replaced. *See* D.I. 48, ¶ 67(e).

Under the second prong of the *Zuckerberg* test, "[a] plaintiff must plead a substantial likelihood of liability for the threat to give rise to a reasonable doubt as to a director's ability to impartially consider a demand."[124] "To establish a substantial likelihood of liability at the pleading stage, a plaintiff must make a threshold showing, through the allegation of particularized facts, that their claims have some merit."[125] As alleged, Stuck "possesses first-hand knowledge that the [Condominium] has always held individual unit owners responsible for the repairs and maintenance to windows."[126] For the reasons stated above, the Windows are common elements, and the Association and Council have the duty to maintain them. Thus, she was not misinformed about the Association or Council's duty in maintaining the Windows. While directors of a Delaware corporation must exercise the requisite degree of care in the process of decision-making and act on an informed basis,[127] there is no particularized allegation in the Complaint that Stuck, in her capacity as a Council member, did not act on an informed basis or that she acted in bad faith. Her decision-making was informed by an engineering report obtained by

---

[124] *Simons v. Brookfield Asset Mgmt. Inc.*, 2022 WL 223464, at *11 (Del. Ch. Jan. 21, 2022).

[125] *Firemen's Ret. Sys. of St. Louis on behalf of Marriott Int'l, Inc. v. Sorenson*, 2021 WL 4593777, at *8 (Del. Ch. Oct. 5, 2021). (internal quotation marks and citations omitted).

[126] D.I. 48, ¶ 67(e).

[127] *See* 1 R. Franklin Balotti & Jesse A. Finkelstein, Balotti and Finkelstein's Delaware Law of Corporations and Business Organizations § 4.15 (4th ed. Supp. 2022-1).

Binner on behalf of the Association.[128]  Assuming that the Council members' duty of care is not exculpated by a provision in the Association's certificate of incorporation,[129] the pleaded facts do not reveal a claim for which Stuck faces a substantial likelihood of liability.

Under the third prong of the *Zuckerberg* test, I consider whether Stuck "lacks independence from someone who received a material personal benefit."[130] "To show a lack of independence, a derivative complaint must plead with particularity facts creating a reasonable doubt that a director is ... so beholden to an interested director ... that his or her discretion would be sterilized."[131] Here, no such particularized facts have been alleged – only conclusory statements that Binner "dominated and

---

[128] D.I. 48, ¶ 40. *See also* 8 *Del. C.* §141(e) ("A member of the board of directors … shall, in the performance of such member's duties, be fully protected in relying in good faith upon … such information, opinions, reports or statements presented to the corporation by any of the corporation's officers or employees, or committees of the board of directors, or by any other person as to matters the member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the corporation.").  While the Kablaouis have questioned the accuracy of this report, they have not alleged particularized facts that would indicate that Stuck did not rely upon that engineer's report in good faith. *See* D.I. 48, ¶¶ 41-42. Accordingly, she is entitled to protection in relying upon the report of a professional engineer selected by the Association in discharging her fiduciary duties.

[129] *See* 8 *Del. C.* §102(b)(7).  The Association's certificate of incorporation is not in the record so it is unclear whether that document affects Council members' duty of care.

[130] *Zuckerberg*, 262 A.3d 1034, 1059 (Del. 2021).

[131] *Id.*, at 1060 (internal quotation marks and citations omitted) (ellipses in original).

controlled other members of the Association."[132]  Thus, I cannot infer from the facts

in the Complaint that Stuck lacks independence from Binner or Comroe.

In conclusion, I find that the Kablaouis have not met their burden of pleading

particularized facts sufficient to create a reasonable doubt that a majority of the

Council members could not exercise disinterested and independent judgment

regarding a pre-litigation demand.  Therefore, demand is not excused under Rule

23.1.  I therefore recommend that the Court dismiss the remaining claims of the

Complaint.[133]

---

[132] D.I. 48, ¶ 67(h).

[133] In the Complaint, the Kablaouis alleged that the Defendants had breached their fiduciary duties by changing the Governing Documents to eliminate the prohibition on sweeping dirt off units' porches, changing the Governing Documents to eliminate the prohibition on barking dogs, allowing Binner unfettered access to all units, and improperly subsidizing the servicing of individual units' HVAC systems and treatment for an ant infestation. *See* D.I. 48, ¶¶ 11-27, 67(a)-(d).  The Kablaouis' answering brief indicated that they were not pursuing a breach of fiduciary duty claim based upon these facts. *See* D.I. 54, at 24.  To the extent that these are still live claims, these instances of alleged fiduciary breaches by members of the Council are derivative claims, and they should be dismissed for lack of demand futility.

Counts III and IV of the Complaint seek declaratory and injunctive relief related to the alleged breaches of contract and fiduciary duty. *See* D.I. 48, ¶¶ 78-95.  These "'claims' … are remedies, rather than causes of action." *iBio, Inc. v. Franhofer USA, Inc.*, 2020 WL 5745541, at *12 (Del. Ch. Sept. 25, 2020) (citing *Quadrant Structured Prod. Co. v. Vertin*, 102 A.3d 155, 203 (Del. Ch. 2014)).  Because the substance of these claims have been addressed, they should be dismissed for the reasons already stated. *See Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, 2014 WL 6703980, at *29 (Del. Ch. Nov. 26, 2014).

I do not reach the various arguments offered by Defendant in the Motion, including liability limitations under 10 *Del. C.* § 8113, the business judgment rule, and laches, *see* D.I. 51, at 20-24, because I hold on alternative grounds.

## IV.    Conclusion

For the reasons set forth above, I recommend that the Court dismiss the Complaint in its entirety.  This is a final master's report, and exceptions in this expedited matter may be taken under Court of Chancery Rule 144(d)(2).  The stay of exceptions on the Order Entering Briefing Schedule on the Motion to Dismiss and Staying Discovery[134] is lifted, and exceptions may be taken to that order under Court of Chancery Rule 144(d)(2).

---

[134] D.I. 50.